**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CARLA D. CALEY, | ) | CASE NO. 5:11-cv-1146 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Carla D. Caley ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying her

applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. §

636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I.    PROCEDURAL HISTORY

On August 16, 2006, Plaintiff protectively filed applications for a POD, DIB and

SSI and alleged a disability onset date of January 1, 2005.  (Tr. 10.)  Her applications

were denied initially and upon reconsideration, so she requested a hearing before an

administrative law judge ("ALJ").  (Tr. 10)  On April 27, 2009, an ALJ held Plaintiff's

hearing.  (Tr. 10.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr.

10.)  A medical expert ("ME") and vocational expert ("VE") also appeared and testified.

(Tr. 10.)  On September 3, 2011, the ALJ found Plaintiff not disabled.  (Tr. 34.)  On May

26, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's

decision became the Commissioner's final decision.  (Tr. 1.)

On June 6, 2011, Plaintiff filed her complaint to challenge the Commissioner's

final decision.  (Doc. No. 1.)  On February 18, 2012, Plaintiff filed her Brief on the

Merits.  (Doc. No. 24.)  On April 2, 2012, the Commissioner filed his Brief on the Merits.

(Doc. No. 27.)  On April 15, 2012, Plaintiff filed a Reply Brief.  (Doc. No. 28.)

Plaintiff asserts two assignments of error:  (1) the ALJ improperly relied on the

ME's opinion that Plaintiff should not have been diagnosed with fibromyalgia; and (2)

the ALJ improperly assessed Plaintiff's credibility.[1]

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

From January 1, 2005, the alleged onset date, through the date of the ALJ's

decision, Plaintiff was a "younger individual" between 18 and 44 years of age.  (Tr. 31.)

---

[1] Plaintiff's argument regarding the ALJ's reliance on the ME's opinion is
embedded in her argument section in her Brief on the Merits regarding the
ALJ's assessment of her credibility.  These are separate and distinct legal
issues.  Plaintiff's counsel would do well in the future to set forth separate and
distinct legal arguments in separate and distinct argument sections.

She had a high school education, a degree from a technical school, and was able to communicate in English.  (Tr. 32.)  Her education did not provide for direct entry into skilled work.  (Tr. 32.)  She had past relevant work experience as a "parts reclamation person."  (Tr. 31.)

### B.    Medical Evidence

Since at least 1996, Plaintiff had presented to Dr. Laura Novak, M.D., for a variety of complaints that included pain, anxiety, and depression.  (Tr. 532.)  On July 29, 1996, Dr. Novak indicated that Plaintiff was depressed and referred Plaintiff to "Portage Path."  (Tr. 532.)

On October 2, 1997, Plaintiff was admitted to Portage Path Community Mental Health Center because Plaintiff "felt overwhelmed by multiple situational stressors."  (Tr. 253.)  Dr. Roger Sparhawk, M.D., a psychiatrist, evaluated Plaintiff and assessed her with a recurrent major depressive disorder.  (Tr. 254.)

On May 1, 1998, Plaintiff presented to Dr. Novak for a follow-up on an upper respiratory infection.  (Tr. 523.)  Dr. Novak indicated that Plaintiff was "developing some overuse symptoms" from working, and she assessed Plaintiff with "overuse symptoms, possible early fibromyositis."[2]  (Tr. 523.)

On October 20, 2003, Plaintiff presented to Dr. Novak for with several complaints that included continued pain in her shoulders, flanks, and (for the first time) lower

---

[2] Fibromyocitis is "inflamation of fibromuscular tissue."  Dorland's Illustrated Medical Dictionary 697 (30th ed. 2003).  It is included in "[a] group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures."  The Merck Manual 481 (17th ed. 1999).

3

extremities.  (Tr. 499.)  Dr. Novak indicated that Plaintiff had a mildly improved mood

disorder and had chosen not to follow up with a counselor.  (Tr. 499.)  On July 17,

2003, however, Dr. Novak assessed Plaintiff with "[a]nxiety and depression with

inadequate control with current medications."  (Tr. 502.)

On November 4, 2003, Plaintiff presented to Dr. Robert S. Geiger, M.D., with

complaints of headaches and pain in her legs, lower back, and abdomen.  (Tr. 468.)

On November 13, 2003, Dr. Geiger indicated that Plaintiff reported she suffered

migraine headaches and took Vicodin, and that the Vicodin made her headaches

worse.  (Tr. 467.)  Dr. Geiger also indicated that Plaintiff reported she suffered restless

leg syndrome and occasionally suffered numbness in her arms and hands.  (Tr. 467.)

Dr. Geiger started Plaintiff on Percocet.  (Tr. 467.)

On November 26, 2003, Plaintiff presented to Dr. Jonathan Edwards, M.D., for

an evaluation of left shoulder and left-sided back pain.  (Tr. 498.)  Dr. Edwards

assessed Plaintiff with a cervical strain and lumbar strain, prescribed Plaintiff with

physical therapy, and encouraged Plaintiff to keep her shoulder mobile.  (Tr. 498.)

On May 27 and June 3, 2004, Dr. Geiger provided Plaintiff spinal injection

treatments.  (Tr. 462-63.)

On July 19, 2004, Plaintiff presented to Dr. Feyrouz T. Al-Ashkar, M.D., upon

referral from the Human Resources department at Plaintiff's workplace for a

consultative examination.  (Tr. 256.)  Dr. Al-Ashkar indicated that Plaintiff exhibited 18

out of 18 "tender points."  (Tr. 257.)  Dr. Al-Ashkar was of the impression that Plaintiff

suffered fibromyalgia and "[p]ossible depression."  (Tr. 258.)  He further indicated that

Plaintiff "may need to stop" using Percocet and the Duragesic patch because "they're

4

not helping"; and he recommended that Plaintiff exercise, quit smoking, and "see a

[p]sychiatrist for depression."  (Tr. 258.)

On August 9, 2004, Plaintiff presented to Dr. Novak for a "recheck."  (Tr. 283.)

Dr. Novak indicated the following.  Plaintiff had "several issues including fibromyalgia

and chronic right-sided abdominal pain."  (Tr. 283.)  Prior testing also revealed that

Plaintiff had small kidney stones, although they were not obstructive.  (Tr. 283.)  Plaintiff

"denie[d] any ambivalence[,] . . . that depression [was] interfering with her medical care

. . . [and] any significant mood disorder or road blocks to getting care."  (Tr. 283.)  Dr.

Novak discussed with Plaintiff that she could not, "in good conscience," write Plaintiff

work excuses for Plaintiff's symptoms if Plaintiff was not following "the plan" upon which

they agreed.  (Tr. 283.)  Dr. Novak reviewed Plaintiff's job duties with Plaintiff, and

Plaintiff reported that she believed she was physically able to perform those job duties,

although they exacerbated her pain.  (Tr. 283.)  Specifically, Plaintiff reported that,

when she did "a lot" of bending, pushing, or lifting, she developed persistent right-sided

pain.  (Tr. 283.)  Dr. Novak "reminded [Plaintiff] that her pain may not be amenable to

medical intervention and [that Plaintiff] may need to put more energy into mind body

work."  (Tr. 283.)  Dr. Novak continued that she "discussed with [Plaintiff] that she [was]

not making clear progress with her disability and . . . may need to put more energy in

her own area of control rather than looking for physicians to fix her illness."  (Tr. 283.)

On October 21, 2004, Plaintiff presented to Dr. Novak for a follow-up.  (Tr. 280.)

Dr. Novak indicated that Plaintiff reported she returned to work, had been working for

the past three weeks, and felt "it has been pretty successful."  (Tr. 280.)  On December

2, 2004, however, Dr. Novak indicated that Plaintiff reported the following.  (Tr. 279.)

5

Plaintiff was having difficulties at work in part because she was required to work in a factory and on loading docks where there were extremes in the environmental temperatures.  (Tr. 279.)  Dr. Novak confirmed that fibromyalgia may be exacerbated by changes in temperature, although the degree of the effect could not be quantified and predominantly was subjective.  (Tr. 279.)

On February 1, 2005, Plaintiff returned to Dr. Al-Ashkar for a follow-up.  (Tr. 263.)  Dr. Al-Akshar indicated that Plaintiff reported pain and joint stiffness in her neck, shoulders, back, arms, and knees.  (Tr. 263.)  Dr. Al-Ashkar indicated upon examination that Plaintiff exhibited 12 out of 18 "tender points."  (Tr. 265.)  Dr. Al-Ashkar also indicated that Plaintiff denied depression and anxiety.  (Tr 264.)

On February 3, 2005, Plaintiff presented to Dr. Novak for a follow-up.  (Tr. 277.)  Dr. Novak indicated that she believed Plaintiff was "significantly depressed and . . . has fibromyalgia and chronic pain which are separate entities, [and] her depression is significantly affecting her energy levels and her quality of life."  (Tr. 277.)  Dr. Novak recommended that Plaintiff undergo a psychiatric consultation, take Doxepin and Soma at night as advised by Plaintiff's physicians at the Cleveland Clinic, and discuss with the Pain Clinic a change in her medication.  (Tr. 277.)

On February 21, 2005, Plaintiff presented to Dr. Novak for a "recheck of fibromyalgia flare."  (Tr. 275.)  Dr. Novak indicated that Plaintiff reported the following. For the prior two weeks, Plaintiff suffered a "substantial flare of pain in her knees" and had been unable to walk normally.  (Tr. 275.)  Her knees were not stiff or swollen, and she had "no pain in other joints."  (Tr. 275.)  Upon examination, Dr. Novak indicated that Plaintiff had full range of motion in her knees, although she exhibited point tenderness

6

along the joint lines bilaterally and pain with palpation.  (Tr. 275.)  Dr. Novak assessed

Plaintiff with "[p]robable tinea"; chronic fibromyalgia that was worsening, with secondary

issues of discouragement, low energy, and an overall lack of feeling well; and pain in

her knees with no evidence of arthritis.  (Tr. 275.)  Dr. Novak offered several theories to

explain Plaintiff's knee pain, including that it could be arthralgia, a flare of fibromyalgia,

or structural abnormalities.  (Tr. 275.)  Dr. Novak discussed with Plaintiff that

"fibromyalgia is usually not a completely disabling disease"; that Plaintiff "may need to

be trained in a less physically demanding job"; and that Plaintiff "should be striving to

find ways to struggle against the pain."  (Tr. 276.)  Dr. Novak also indicated that she

"recommended that [Plaintiff] consider treatment for possible depression as [Plaintiff]

ha[d] not responded to the medications [Dr. Novak] . . . tried in the past," and that any

treatment should "be done under an expert's care."  (Tr. 275.)

On April 1, 2005, Plaintiff presented to Dr. Douglas J. Chonko, D.O., for a

consultative examination of her bilateral knee pain.  (Tr. 288.)  Dr. Chonko indicated

that Plaintiff reported the following.  Plaintiff's knee pain was severe, and the right knee

was worse than the left knee.  (Tr. 288.)  Plaintiff had suffered the knee pain for one or

two years; and the pain was exacerbated with activities, ambulation, and weight-

bearing.  (Tr. 288.)  She experienced intermittent "catching," but she did not experience

"locking" or instability.  (Tr. 288.)

Dr. Chonko indicated the following upon physical examination.  Plaintiff exhibited

tenderness to palpation along the medial and lateral joint lines of both knees, as well as

"multiple tender points on [her] back, shoulders, and upper arms."  (Tr. 289.)  Dr.

Chonko assessed Plaintiff with "[m]edial meniscal tear bilateral knees."  (Tr. 289.)  Dr.

7

Chonko recommended that Plaintiff undergo arthoscopic surgery on both knees, although he believed that Plaintiff's restless leg syndrome and fibromyalgia would prevent Plaintiff from obtaining full relief from her pain.  (Tr. 289.)  Later that month, Plaintiff underwent right knee arthroscopic surgery.  (Tr. 290, 292.)

On July 22, 2005, Dr. Chonko indicated that Plaintiff reported her knee had begun to feel better and her pain had improved from pre-operative levels.  (Tr. 293.)  Dr. Chonko reported that Plaintiff ambulated independently and with a normal gait.  (Tr. 293.)  On August 29, 2005, Dr. Chonko indicated that Plaintiff reported the following.  (Tr. 294.)  Plaintiff's knee pain at rest was "better," but she continued to suffer significant pain with activity and weight-bearing.  (Tr. 294.)  She had difficulty climbing stairs.  (Tr. 294.)  Dr. Chonko assessed Plaintiff with "[c]hondromalacia patella, bilateral knees" and "pain, bilateral knees."  (Tr. 294.)  Dr. Chonko recommended that Plaintiff undergo vocational rehabilitation because he believed Plaintiff "would do well with returning to school in concentrating on the desk type job," as "she would have great difficulty going back to a physical type job."  (Tr. 294.)

On September 13, 2005, Plaintiff presented to Dr. Shameem M. Ahmed, M.D., with complaints of "gerd, nausea and lower left quadrant pain."  (Tr. 309.)  Dr. Ahmed indicated upon examination that Plaintiff denied depression and anxiety.  (Tr. 310.)  On March 28, 2006, Dr. Ahmed indicated upon examination that there was "no evidence of depression, anxiety or agitation."  (Tr. 305.)

On October 18, 2006, state agency reviewing physician Rebecca R. Neiger, M.D., reviewed Plaintiff's medical records and assessed Plaintiff's physical residual functional capacity ("RFC") as follows.  (Tr. 470-77.)  Plaintiff primarily suffered

8

chondromalacia patella and meniscal damage.  (Tr. 470.)  She had a secondary

diagnosis of restless leg syndrome.  (Tr. 470.)  Fibromyalgia was another "alleged

impairment."  (Tr. 470.)  She could lift and carry 50 pounds occasionally and 25 pounds

frequently; and sit, stand, and walk for about 6 hours in an 8-hour workday with normal

breaks.  (Tr. 471.)  Her ability to push and pull were unlimited except to the extent that

they were limited by her ability lift and carry.  (Tr. 471.)  She could never climb ladders,

ropes, or scaffolds; and she could occasionally kneel, crouch, and crawl.  (Tr. 472.)

She had no manipulative, visual, communicative, or environmental limitations.  (Tr. 473-

74.)

     Dr. Neiger based her assessment on the evidence that:  Plaintiff's physical

exams were normal with the exception of some knee pain; Plaintiff successfully

underwent a right knee arthoscopy and exhibited a normal gait with no effusion or

instability; and Plaintiff used strong medication for diffuse pain.  (Tr. 471.)  Dr. Neiger

noted that there was no evidence of "trigger points" or "injections."  (Tr. 471.)  Dr.

Neiger concluded that Plaintiff's allegations were not credible because they were out of

proportion with the objective evidence.  (Tr. 471.)  On March 28, 2007, state agency

reviewing physician Diane Manos, M.D., affirmed Dr. Neiger's assessment.  (Tr. 610.)

     On October 20, 2006, Plaintiff presented to psychologist Gary J. Sipps, Ph.D.,

for a mental evaluation upon the request of the Bureau of Disability Determination.  (Tr.

575.)  Dr. Sipps diagnosed Plaintiff with a dysthymic[3] disorder and alcohol abuse in full

remission; and he declined to advance any other diagnoses.  (Tr. 579.)  Dr. Sipps

---

[3] "Dysthymic" means "depressed."  Dorland's Illustrated Medical Dictionary 579
(30th ed. 2003).

assessed Plaintiff as follows.  Plaintiff appeared moderately impaired in her abilities to comprehend complex material; remember; sustain concentration and persistence, maintain social interaction; relate with the general public, supervisors, and co-workers; adapt; and respond appropriately to novel situations and variations in the work setting. (Tr. 579-80.)  She appeared mildly limited in her abilities to understand; concentrate and attend to tasks; and interact with "familiar others."  (Tr. 579-80.)  Dr. Sipps assigned Plaintiff with a Global Assessment of Functioning ("GAF") score of 48[4] and concluded that Plaintiff's overall functioning [was] at a moderately reduced level of efficiency."  (Tr. 580.)

On November 19, 2006, state agency reviewing psychologist Karen Stailey-Steiger, Ph.D., reviewed Plaintiff's medical records, performed a Psychiatric Review Technique, and assessed Plaintiff's mental RFC.  (Tr. 585-601.)  Dr. Stailey-Steiger indicated the following in her Psychiatric Review Technique.  She assessed Plaintiff under Listings 12.04 regarding affective disorders and 12.09 regarding substance addiction disorders.  (Tr. 585.)  Plaintiff's dysthymia was a medically determinable impairment under Listing 12.04, and Plaintiff's alcohol abuse in reported sustained full remission was a medically determinable impairment under Listing 12.09. (Tr. 588, 593.)  Plaintiff had moderate restrictions in maintaining social functioning and concentration, persistence, or pace; had mild restrictions in her activities of daily living;

---

[4] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

10

and had no episodes of decompensation for extended duration.  (Tr. 595.)  Further, the

evidence did not establish the presence of Listing 12.04's "C" criteria.  (Tr. 596.)

Dr. Stailey-Steiger indicated the following in her mental RFC assessment.

Plaintiff was moderately limited in her abilities to:  understand, remember, and carry out

detailed instructions; maintain attention and concentration for extended periods;

perform activities within a schedule, maintain regular attendance, and be punctual

within customary tolerances; complete a normal workday and workweek without

interruptions from psychologically based symptoms and perform at a consistent pace

without an unreasonable number and length of rest periods; interact appropriately with

the general public; maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness; respond appropriately to changes in the work

setting; and set realistic goals or make plans independently of others.  (Tr. 599-600.)

She was mildly limited in her abilities to remember locations and work-like procedures;

understand, remember, and carry out very short and simple instructions; and sustain an

ordinary routine without special supervision.  (Tr. 599.)  There was insufficient evidence

to determine the extent to which Plaintiff was limited in the other areas of functioning.

(Tr. 599-600.)

In summary, Dr. Stailey-Steiger opined that Plaintiff was "mentally capable of

simple, few-step tasks in settings free of frequent routine changes or strict time or

production demands"; and that she was "capable of relating to others on a superficial

basis."  (Tr. 601.)  On March 20, 2007, state agency reviewing psychologist Steven J.

Meyer, Ph.D., affirmed Dr. Stailey-Steiger's assessment.  (Tr. 609.)

On January 16, 2007, Plaintiff presented to Dr. Barbara Zara, M.D., at Portage

Path for a psychiatric evaluation.  (Tr. 604-07.)  Dr. Zara indicated that Plaintiff reported the following.  Plaintiff complained of depression, hearing voices, paranoia, and an inability to sleep.  (Tr. 604.)  Plaintiff had a long psychiatric history and multiple psychiatric symptoms, including several suicide attempts by cutting her wrists.  (Tr. 604, 606.)  She also had fibromyalgia, a history of a head injury caused by an automobile accident, sleep apnea, and restless leg syndrome.  (Tr. 605.)  She suffered pain and had "been treated with almost all psychotropic medications, but is noncompliant and satisfied with the results."  (Tr. 604.)  Dr. Zara's diagnoses of Plaintiff included a mood disorder not otherwise specified and a history of a major depressive disorder.  (Tr. 606.)  Dr. Zara prescribed Plaintiff Seroquel and Cymbalta.  (Tr. 607.)

On June 22, 2007, plaintiff presented to Dr. Chonko for a follow-up on her right knee pain.  (Tr. 663.)  Dr. Chonko indicated that Plaintiff continued to complain of severe localized pain in the "retropatellar region" with "intermittent stabbing type symptoms to the medial joint line."  (Tr. 663.)  He indicated that Plaintiff also continued to complain of pain in her left knee similar to that in her right knee.  (Tr. 663.)  Dr. Chonko recommended nonoperative management of her knee pain, including the use of NSAIDs and a brace.  (Tr. 663.)

On July 5, 2007, Plaintiff presented to Dr. Geiger for a follow-up regarding "her chronic rights shoulder, right knee, neck and low back pain."  (Tr. 711.)  Dr. Geiger indicated the following.  Plaintiff suffered osteoarthritis of the knees, pain in her shoulder, and myalgia.  (Tr. 712.)  Between May 31 and July 5, 2007, Plaintiff had been prescribed Percocet, Flexeril, Midrin, and the Duragesic patch.  (Tr. 711.)  Plaintiff reported that "she [did] not feel her medications [were] helpful yet and . . . she still [had

not] refilled her Percocet [or] her Flexeril."  (Tr. 711.)  Nevertheless, Plaintiff's "progress [was] stable," and Plaintiff "[felt] adequate analgesia."  (Tr. 712.)  Plaintiff's "quality of life ha[d] improved secondary to pain med[ications]," and Plaintiff "[was] able to perform Activities of Daily Living."  (Tr. 712.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows.  Plaintiff suffered from fibromyalgia, knee pain, back pain, shoulder pain, neck pain, endometriosis, carpal tunnel syndrome in both wrists, hiatal hernia, diverticulosis, migraines, and kidney stones.  (Tr. 39-40.) She could lift a 5 pound bag of sugar and a gallon jug of milk; she could not lift a 20 pound bag of potatoes.  (Tr. 40.)  She could walk for about 15 minutes, stand for about 20 minutes, and sit for about a half an hour before she had to stand and stretch.  (Tr. 41-42.)  She had "problems" going up and down stairs; and she could not stoop, crouch, squat, kneel, or crawl.  (Tr. 41-42.)

Plaintiff also suffered depression and anxiety.  (Tr. 42.)  She attempted suicide twice—one time as a teenager and the other time as an adult.  (Tr. 43.)  She still thought about suicide, as she was "tired of being in pain all the time and not being able to do the things [she] used to be able to do."  (Tr. 43.)  Further, she had a fear of leaving home and only left home a couple of times a month accompanied by her grandmother or aunt.  (Tr. 43-45.)

Plaintiff held her last job for seven years.  (Tr. 46-47.)  The job required dealing with other people, but Plaintiff "didn't get along with them."  (Tr. 47.)  She was fired

13

because her physical and mental ailments caused her to miss work too often.  (*See* Tr. 47-49.)

Plaintiff spent a usual day alone in her room, either watching the television or sleeping.  (Tr. 50.)  She attempted physical therapy to help her fibromyalgia, but it made her pain worse.  (Tr. 51.)  She performed home exercises, but the exercises did not provide her with long-lasting relief.  (Tr 51.)

## 2.    The Medical Expert's Hearing Testimony

Dr. Hershel Goren, M.D., reviewed Plaintiff's medical records and testified as a medical expert at Plaintiff's hearing.  (Tr. 53-78.)  Dr. Goren indicated that he was a physician certified in neurology.[5]  (Tr. 53.)  He explained that although Plaintiff had been diagnosed with fibromyalgia, "fibromyalgia is a diagnosis of exclusion and it cannot be made when there's another diagnosis that might be confused with fibromyalgia[; f]or example, torn menisci."  (Tr. 55, 64.)

Dr. Goren further testified as follows.  Plaintiff suffered the following severe impairments:  bilateral medial meniscus tears in her knees, obstructive sleep apnea, a mood disorder not otherwise specified, post-traumatic stress disorder, and substance abuse.  (Tr. 58-59.)  Under Listings 12.04 and 12.06, Plaintiff was mildly restricted in her activities of daily living; moderately restricted in her abilities to maintain social functioning and concentration, persistence, or pace; and had no episodes of decompensation.  (Tr. 61-62.)  The evidence did not establish the "C" criteria under the Listings.  (Tr. 62.)

---

[5] Plaintiff counsel stipulated to Dr. Goren's professional qualifications and did not object to Dr. Goren giving opinions on subjects other than neurology.  (Tr. 54.)

14

Plaintiff retained a capacity for work that involved lifting and carrying 20 pounds occasionally and 10 pounds frequently.  (Tr. 63.)  Plaintiff could occasionally use foot controls, stoop, and crouch.  (Tr. 63.)  She could never climb ladders, ropes, scaffolds, ramps, or stairs; and never kneel or crawl.  (Tr. 63.)  She was restricted from exposure to dangerous machinery and unprotected heights; and she was restricted from high production quotas (i.e., assembly work or piece rate work) and more than superficial interaction with supervisors, co-workers, and the general public (i.e., she could not engage in activities such as arbitration, negotiation, confrontation, or supervision of others, or be responsible for the safety and welfare of others).  (Tr. 63.)

There was no evidentiary basis to conclude that Plaintiff had restrictions on walking, standing, or sitting.  (Tr. 64.)  Dr. Chonko's restriction of Plaintiff to sedentary work activity[6] was not supported by the evidentiary record.  (Tr. 64, 67.)  And Plaintiff's GAF scores were high enough that Plaintiff would not be housebound by her mental condition.  (Tr. 78.)

### 3.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

I want you to assume a person whose date of birth is December 12, 1969; someone who is a high school graduate and who got a diploma from a . . . 2-year[] technical school[] in electronics . . . and someone whose past relevant work [was] this claimant's past relevant work[.]  That's for all the hypothetical[s].  Now, for hypothetical number one[, t]his person is limited to sedentary work only, with all that implies with respect to exertional and postural activities, subject to the following limitations:  no using foot controls

---

[6] The conclusion that Dr. Choko restricted Plaintiff to sedentary work is based on Dr. Chonko's opinion that Plaintiff "would do well with returning to school in concentrating on the desk type job," as "she would have great difficulty going back to a physical type job."  (Tr. 67.)

more than occasionally; no climbing steps, ramps, ladder[s] or scaffolds at all; no kneeling or crawling at all; no work in proximity to unprotected heights, dangerous machinery, or other workplace hazards; no high production quotas; no assembly line work; no piece rate work; no negotiation, arbitration, confrontation or other intense inter-personal interactions with the public, co-workers, or supervisors; no supervising or managing other people; and no being responsible for the health, safety, or welfare of other people.

(Tr. 88.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work as a charge account clerk (for which there were 200 jobs in the regional economy, 3,000 jobs in the state, and 85,000 jobs in the national economy), microfilming document preparer (for which there were 500 jobs in the regional economy, 3,000 jobs in Ohio, and 80,000 jobs in the national economy), and food and beverage order clerk (for which there were 400 jobs in the Akron, Ohio, area, 5,000 jobs in Ohio, and 100,000 jobs in the national economy).  (*See* Tr. 91-92.)

The ALJ modified the first hypothetical to include that there would be no contact with the general public and only minimal contact with co-workers and supervisors.  (Tr. 92.)  The VE testified that such a person could not perform any work at the sedentary exertion level.  (Tr. 92.)

The ALJ then offered a third, stand-alone hypothetical that provided the person would be absent from work, on average, at least once a week because of her impairments.  (Tr. 92.)  The VE testified that such a limitation "would disqualify any jobs in the economy."  (Tr. 92.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles, the Occupational Employment Quarterly, and the Job Browser, as adjusted conservatively to account for any changes in the economy.  (Tr. 92-93.)

16

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

17

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), and 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Ms. Caley first met the insured status requirements of the Social
      Security Act on April 1, 2000, and continued to meet them through
      December 31, 2010.

2.    Ms. Caley last worked on February 9, 2005. She engaged in
      substantial gainful activity ("SGA") and provid[ed] "services" in
      January and February 2005.  She did not engage in SGA or provid[e]
      "services" from March 1, 2005 through the date of this decision.

3.    From January 1, 2005, the alleged onset date, through the date of
      this decision, Ms. Caley had and has the following severe
      impairments:

      Bilateral medial meniscus tears of the knees, status post surgical
      repair bilaterally and subsequent bilateral chondromalacia patella[;]

      A sleep disorder or disorders, i.e. obstructive sleep apnea and/or
      restless leg syndrome[;]

      Mood disorder not otherwise specified[; and]

      Anxiety and/or post-traumatic stress disorder.

4.    From January 1, 2005, the alleged onset date, through the date of
      this decision, Ms. Caley did not and does not have an impairment or
      combination of impairments that met, meets, medically equaled, or
      medically equals any of the listed impairments in 20 CFR Part 404,
      Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that from January 1, 2005, the alleged onset date, through the date of this decision, Ms. Caley had and has the residual functional capacity to perform work activities except for the following limits on her ability to work:

Ms. Caley could and can do work at the sedentary exertion level, and not at any other exertion level, with all that implies with respect to her ability to engage in exertional and postural activities, subject to the following additional limitations.

Ms. Caley could not and cannot use foot controls more than occasionally.

Ms. Caley could not and cannot climb steps, ramps, ladders, ropes, or scaffolds.

Ms. Caley could not and cannot kneel or crawl.

Ms. Caley could not and cannot work in proximity to unprotected heights, dangerous machinery, or other workplace hazards.

Ms. Caley could not and cannot do work involving high production quotas.

Ms. Caley could not and cannot do assembly line work or piece rate work.

Ms. Caley could not and cannot do work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors.

Ms. Caley could not and cannot do work involving supervising or managing other people.

Ms. Caley could not and cannot do work involving her being responsible for the health, safety, or welfare of other people.

6.    From January 1, 2005, the alleged onset date, through the date of this decision, Ms. Caley was and is unable to perform any past relevant work.

. . . . .

10.    Ms. Caley did not acquire job skills transferable to any work that she

19

could do consistent with the residual functional capacity stated in the first paragraph of Finding #5 above.

11.   From January 1, 2005, the alleged onset date, through the date of this decision, considering Ms. Caley's age, education work experience, and residual functional capacity, there were and are jobs that existed and exist in significant numbers in the regional and national economy that Ms. Caley could and can perform.

12.   Ms. Caley was not and is not under a disability, as defined in the Social Security Act, from January 1, 2005, the alleged onset date, through the date of this decision.

(Tr. 12-34.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

20

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.  *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009).

### B.    The ALJ's Reliance on the ME's Testimony

The ALJ found that Plaintiff's fibromyalgia was not a severe impairment because he agreed with the ME, Dr. Goren, that "fibromyalgia is a diagnosis of exclusion and is not an appropriate diagnosis in a case such as this one in which the individual has other medically determinable impairments that are capable of producing the pain complained of."  (Tr. 15.)  Plaintiff contends that Dr. Goren's opinion is "contrary to both agency policy and generally accepted medical science."  (Pl.'s Br. 14.)  Plaintiff concludes that "the ALJ's decision is not supported by substantial evidence where critical parts of the decision are based on evidence that is contrary to both agency policy and generally accepted medical science."  (Pl.'s Br. 14.)  For the following reasons, this assignment of error is not well taken.

Plaintiff has failed to provide an adequate basis to conclude that Dr. Goren's opinion is "contrary to both agency policy and generally accepted medical science."  Dr. Goren was a certified neurologist (Tr. 10), and Plaintiff's counsel stipulated to Dr.

21

Goren's qualifications at Plaintiff's hearing (Tr. 54).  An ME's testimony constitutes expert medical evidence upon which an ALJ may rely.  *See* S.S.R. 96-6p, 1996 WL 374180, at *1 (S.S.A.); *Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001).  Plaintiff cites *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003), for the proposition that Dr. Goren's opinion is inconsistent with agency policy and generally accepted medical science; but *Green-Younger* is not a case from this jurisdiction and only explains how a diagnosis of fibromyalgia may be established.  Plaintiff cites no legal authority that shows Dr. Goren's opinion is invalid,[7] and no legal authority that shows remand would be appropriate if it were.

Further, even if Dr. Goren's opinion were invalid, Plaintiff has failed to show that the ALJ's reliance on the opinion was harmful.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health &*

---

[7] The Sixth Circuit has recognized that confirming the existence of fibromyalgia "is a process of *diagnosis by exclusion* and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients."  *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988) (per curiam) (emphasis added).

*Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  All of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Notwithstanding Dr. Goren's opinion, the ALJ recognized Plaintiff's diagnosis of fibromyalgia and explained that he was "not persuaded by the medical evidence that the fibromyalgia, on its own . . . had more than a minimal effect on [Plaintiff's] ability to do basic work activities[] for a continuous period of at least 12 consecutive months." (Tr. 15.)  But Plaintiff cleared step two of the disability determination analysis upon the ALJ's finding of other severe impairments.  *See Anthony*, 266 F. App'x at 457.  The ALJ thereafter considered Plaintiff's diagnoses and allegations related to her fibromyalgia in his RFC assessment.[8]  (*See* Tr. 23-25, 28-29.)  Accordingly, any failure to deem Plaintiff's fibromyalgia at step two in this case was, at most, harmless error.[9]

---

[8]  Indeed, the ALJ stated that "[a]lthough [he] did not find fibromyalgia to be a 'severe impairment,' . . . the residual functional capacity . . . below reflects all of the evidence and testimony in the record about it since January 1, 2005."  (Tr. 15.)

[9]  Plaintiff also asserts in a single sentence in her Brief on the Merits that the ALJ improperly failed to find that her headaches constituted a severe impairment. (Pl.'s Br. 14.)  Plaintiff provides no argument with citation to relevant case law and evidence in support of this assertion; accordingly, this argument is deemed waived.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

23

### C.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ failed to assess her credibility properly for two reasons:  (1) Plaintiff's diagnosis of fibromyalgia warrants a more thorough analysis; and (2) the ALJ's findings upon which he based his credibility determination are unsupported by the record.  For the following reasons, these assignments of error are not well taken.

Credibility determinations regarding a claimant's subjective statements rest with the ALJ, *see* *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987), and the ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly, *see* *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

When determining whether a claimant is disabled by pain, the ALJ must (1) consider whether the objective medical evidence supports a finding of an underlying medical condition, and (2) consider whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See* *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).  Here, the ALJ recognized that Plaintiff suffered several medically determinable impairments that could cause Plaintiff's pain, including fibromyalgia; therefore, the first prong of the pain analysis is met.

Pain alone, if caused by a medically determinable impairment, may be severe

24

enough to constitute a disability. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). Difficulty arises when evaluating whether objective medical evidence corroborates allegations of pain caused by fibromyalgia, as those who suffer fibromyalgia present no objectively alarming signs. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 243, 243 (6th Cir. 2007); *Preston*, 854 F.2d at 820 (noting that objective tests are "of little aid or relevance" in determining the existence or severity of fibromyalgia). In other words, objective medical evidence corroborating allegations of pain derived from fibromyalgia is often nonexistent.

An adjudicator is required to consider factors other than just the objective medical evidence when assessing the credibility of a claimant's allegations of pain. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Felisky*, 35 F.3d at 1039; 20 C.F.R. § 404.1529(c)(2). In light of the inherent absence of objective medical evidence in cases of fibromyalgia, evaluation of factors other than objective medical evidence is crucial and must be given significant attention. Such other factors include: statements from the claimant and the claimant's treating and examining physicians; diagnoses; efforts to work; the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky*, 35 F.3d at 1039-40; 20 C.F.R. §§ 404.1529(a) *and* (c)(3); 20 C.F.R. §§ 416.929(a) *and* (c)(3); S.S. R. 96-7p, 1996 WL

374186, at *3 (S.S.A.).  However, courts are not required to *discuss* all of the relevant

factors; an ALJ may satisfy the test under *Duncan* and *Felisky* by considering most, if

not all, of the relevant factors.  *See Bowman v. Chater*, 132 F.3d 32 (Table), 1997 WL

764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

Plaintiff contends that although the ALJ asserted that he considered the relevant

factors, "he did not discuss most of them in his decision and did not give specific

reasons why the factors either added or detracted from [Plaintiff's] credibility."  (Pl.'s Br.

15.)  But an ALJ is required to *consider* and *evaluate* the factors; Plaintiff cites no legal

authority that supports the proposition that the ALJ was required to discuss in detail

each factor and explain how it weighed in his credibility determination, and the Court is

not aware of any.

Further, a review of the ALJ's decision reveals that the ALJ considered and

evaluated most, if not all, of the factors.  The ALJ discussed Plaintiff's allegations at

length before assessing Plaintiff's credibility.  (Tr. 22-25.)  The ALJ recognized Plaintiff

was diagnosed with and complained of fibromyalgia.  (Tr. 15.)  And the ALJ considered

many of the other factors in the context of Plaintiff's allegations.  For example, the ALJ

noted that Plaintiff alleged "constant" pain; that the pain affected Plaintiff's ability to lift,

stand, walk, sit, climb stairs, kneel, squat, bend, reach, and talk; that Plaintiff attempted

to treat her fibromyalgia with physical therapy, but the physical therapy aggravate her

pain; and that Plaintiff took medication for her pain but suffered side effects.  (Tr. 23-

25.)  Finally, the ALJ explained that Plaintiff's daily activities and the opinion of

Plaintiff's treating physician, Dr. Novak, undermined Plaintiff's allegations of the extent

to which she was limited by her impairments.  (Tr. 26.)  Accordingly, to the extent Plaintiff contends that the ALJ failed to assess her credibility in light of the relevant factors other than the objective medical evidence, this assignment of error is not well taken.

Plaintiff also contends that the ALJ's reasons for finding Plaintiff not fully credible are unsupported by the record.  For the following reasons, this assignment of error also is not well taken.

The ALJ specifically explained that Plaintiff's allegations regarding the intensity, persistence, and functionally limiting effects of her impairments were not credible to the extent they would require limitations greater than or in addition to those included in the ALJ's RFC determination because they were inconsistent with the objective medical evidence, as well as for reasons that included the following:

- Plaintiff's daily activities included reading, watching television, going out of the house once a week, and "communicating."  (Tr. 25.)

- Plaintiff engaged in substantial gainful activity from 1998 through 2004, at which time she suffered many of the same impairments that she claimed disabled her as of January 1, 2005.  During that time (specifically on August 9, 2004), Dr. Novak indicated that she told Plaintiff "she is not making clear progress with her disability and she may need to put more energy in her own area of control rather than looking for physicians to fix her illness."  The ALJ interpreted Dr. Novak's statements "to mean not only that [Plaintiff] should but also that she could 'put more energy in her own area of control rather than looking for physicians to fix her illness.'"  (Tr. 26.)

- On February 21, 2005, Dr. Novak indicated that she told Plaintiff "she is manifesting more and more signs of disability[,] . . . fibromyalgia is usually not a completely disabling disease[,] . . . [Plaintiff] may need to be trained in a less physically demanding job, [and] that she should be striving to find ways to struggle against the pain."  The ALJ interpreted Dr. Novak's statements "to mean not only that [Plaintiff] should but also that she could 'be trained in a less physically demanding job' and 'be striving to find ways to struggle against the pain.'"

27

- On at least three occasions—February 2, 2005, September 15, 2005, and March 28, 2006—someone who was treating Plaintiff found no evidence of depression or anxiety upon examination.[10]

- Plaintiff's allegation that she had three inpatient stays within two months because of mental impairments evidenced only short-term exacerbations and not impairments lasting for 12 or more months.

- Although Plaintiff presented at her hearing with a cane, there was no evidence in the record that any treating physician opined it was medically necessary for Plaintiff to use a cane for any continuous 12-month period of time.

- There was no evidence that Plaintiff needed to sit with her feet and knees propped.

(Tr. 25-27.)  Plaintiff contends that the ALJ's findings are unsupported by the record because:

- Her daily activities, as cited by the ALJ, are inadequate to conclude that Plaintiff can perform other work pursuant to the ALJ's RFC determination despite her fibromyalgia.

- The finding that Plaintiff worked for many years with the same impairments she alleges disabled her since January 1, 2005, ignores the evidence that her condition has worsened over time.

- The ALJ's interpretations of Dr. Novak's reports mischaracterize those reports.

- The finding that, on at least three occasions, mental health providers did not indicate upon examination that Plaintiff was depressed ignores the bulk of evidence that Plaintiff present and was diagnosed with depression.

Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Walters*, 127 F.3d at 531.  Here, it is not clear how Plaintiff's alleged daily activities of watching television, reading, leaving home only once a week, and "communicating"

---

[10]  The medical sources to which the ALJ cites are Dr. Al-Ashkar and Dr. Ahmed. (*See* Tr. 264, 305, 309.)

28

contradicts Plaintiff's allegations that she is disabled.  But the ALJ's observation that Plaintiff's work history and the evidence from before and after Plaintiff's alleged disability onset date were inconsistent with Plaintiff's allegations is supported by the record.  The ALJ's interpretation of Dr. Novak's reports do not mischaracterize the evidence, as it was not unreasonable for the ALJ to conclude that Dr. Novak believed Plaintiff had some control over the extent to which her impairments limited her and that Plaintiff would be able to perform less physically demanding jobs.

Further, the ALJ accurately observed that on at least three occasions medical sources indicated that either Plaintiff denied being depressed or there was insufficient evidence that Plaintiff suffered depression.  (*See* Tr. 264, 305, 309.)  Although the record might contain evidence that Plaintiff had depression or otherwise appeared depressed, it was not unreasonable for the ALJ to conclude that Plaintiff's credibility regarding the extent to which her alleged depression limited her was undermined by evidence of occasions when Plaintiff did not suffer or complain of depression.

Finally, Plaintiff's contention that the ALJ failed to account for a worsening in her condition is not accurate, as the evidence the ALJ cited in his credibility assessment (Dr. Novak's second report and Dr. Al-Ashkar's and Dr. Ahmed's examination notes) are dated after Plaintiff's alleged disability onset date.

An ALJ's decision must contain specific reasons for his finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the adjudicator gave to the claimant's statements and the reasons for that weight.  S.S.R. 96-7p, 1996 WL 374186, at *2 (S.S.A.).  Here, notwithstanding that Plaintiff's activities of daily living do

29

not clearly undermine Plaintiff's allegations of the extent to which she is limited, the

ALJ's overall assessment of Plaintiff's credibility is sufficiently specific, clear, and

supported by substantial evidence.  Although the ALJ's opinion could be clearer, "[n]o

principle of administrative law or common sense requires us to remand a case in quest

of a perfect opinion unless there is reason to believe that the remand might lead to a

different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting

*Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  Accordingly, Plaintiff's

contentions that the ALJ improperly assessed her credibility are not well taken.[11]

---

[11] Plaintiff argues for the first time in her Reply Brief that the ALJ's assessment of her credibility is flawed because the ALJ improperly determined Plaintiff's RFC before assessing her credibility.  (Pl.'s Reply 4-6.)  Plaintiff states that "[s]ince writing and submitting Plaintiff's Brief on the Merits, Ms. Caley's counsel has become aware of a very recent case in the Seventh Circuit that should be considered . . . as it involves a reversal of the Commissioner's decision on grounds that are totally applicable herein."  (Pl.'s Reply 4.)  The case to which Plaintiff cites is *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. Jan. 21 2012).  Plaintiff is cautioned that substantive arguments should not be presented for the first time in a reply brief, as such untimely arguments may be deemed waived.  *See United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004) (declining to consider issues not raised in the appellant's opening brief); *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1007 (6th Cir. 2009) ("These waiver and forfeiture rules ensure fair and evenhanded litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute.").  The Court observes that *Bjornson* was rendered on January 21, 2012, and Plaintiff filed her Brief on the Merits on February 18, 2012.  Plaintiff utterly fails to explain why her counsel was not able to discover *Bjornson* before filing her Brief on the Merits, and utterly fails to cite any legal basis for the Court to consider this untimely argument.  Nevertheless, in addition to being waived, this argument lacks merit because a brief review of *Bjornson* reveals that it does not stand for the proposition that Plaintiff suggests.

### VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  June 1, 2012